IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| IN THE MATTER OF THE SEARCHES OF: | |
|---|---|
| SILVER I-PHONE in BLACK AND WHITE CASE, MOBILE CELLULAR PHONE, MODEL A1688, FC ID: BCG-E2946A | Magistrate No. 19-792 |
| NOKIA CELLULAR PHONE in ORANGE CASE, IMEI: 353048060961986 | Magistrate No. 19-793 |
| BLUE AND BLACK ALCATEL CELLULAR PHONE, S/N: B1780002C171SDYR | Magistrate No. 19-794 |
| WHITE HTC CELLULAR PHONE, IMEI: 990007225224697 | Magistrate No. 19-795 |
| VERIZON SAMSUNG FLIP PHONE, MEID HEX: A0000047509619 | Magistrate No. 19-796 |
| BLACK AND SILVER LG CELLULAR PHONE, IMEI: 354885-07-721298-9 | Magistrate No. 19-797 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR SEARCH WARRANTS**

I, Melissa Laukaitis, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2. I am a Special Agent with the United States Drug Enforcement Administration (DEA) having been employed as such for approximately the past thirteen (13) years. I am currently assigned to the DEA Pittsburgh District Office, Group 62. As part of my duties, I am authorized

to conduct investigations of persons who engage in drug trafficking offenses; specifically, the unlawful distribution of controlled dangerous substances in violation of Title 21 United States Code, Sections 841 and 846. I have obtained the information below through my direct involvement in this investigation and through other DEA Special Agents; Task Force Officers, State Officers, as well as reliable confidential sources.

3. Your Affiant has been involved in narcotics related arrests and the execution of search warrants which resulted in the seizure of narcotics, and assisted in the supervision of activities of informants who provided information and assistance resulting in drug buys. During the course of Your Affiant's training and experience, Your Affiant has become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, Your Affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses, conducting physical surveillance, conducting and participating in short-term and long-term undercover operations including reverse undercover drug operations, consensual monitoring and recording of both telephonic and non-telephonic communications, analyzing pen register data, conducting court-authorized wire and oral interception electronic surveillance, and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms, contraband, and evidence of criminal activity.

4. During my assignment with the DEA, I have participated in a wide variety of international and domestic investigations, including money laundering, drug trafficking, and airport interdiction. I have been the case agent for major narcotic investigations that led to the indictment of numerous individuals. I have been the affiant for, and participated in, numerous

wiretap investigations during which I have monitored hundreds of hours of conversations between drug dealers.

5.  I have received specialized training in multiple sessions and/or seminars on the sale and packaging of controlled substances, as well as firearms recognition and the characteristics of an armed gunman. I have utilized this training and experience and have participated in numerous significant arrests for illegal drug trafficking and/or the criminal possession/use of firearms. As a result of these investigations, my training and experience, conversations with other agents, and interviews of drug users and traffickers, I am familiar with the methods and language used by traffickers to smuggle, store, and distribute drugs, collect and launder drug proceeds, and avoid getting caught by law enforcement officers.

6.  As part of my duties, I am authorized to conduct investigations of persons who engage in drug trafficking offenses; specifically, the unlawful distribution of controlled dangerous substances in violation of Title 21 United States Code, Sections 841 and 846. I have obtained the information below through my direct involvement in this investigation and through other DEA Special Agents; Task Force Officers, and other local officers, as well as several reliable confidential sources.

7.  The statements contained in this affidavit are based primarily on discussions with other law enforcement agents and witnesses, information provided to me by other law enforcement agents, review of documents and records, and my personal knowledge, observations, experience and training.

**IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

8.  Your Affiant seeks a search warrant for the six electronic storage devices described in Attachment A.

9.      These devices have been in secure law enforcement custody since the time they were recovered (the circumstances of which are explained more fully below). In my training and experience, I know that the devices have been stored in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the devices first came into the possession of law enforcement.

## PROBABLE CAUSE

10.     In December 2016, while working in an undercover capacity, Penn Hills Detective Nate Laero was standing in a Long John Silver restaurant in Penn Hills, PA, where he was approached by Veryl LONG (NOTE: Detective Laero was familiar with LONG from previous joint drug trafficking investigations with Penn Hills Police and DEA). LONG asked Detective Laero if he was looking for any "tickets". Detective Laero that LONG was referring to drugs when he asked Detective Laero about "tickets". Detective Laero stated that he was looking for "tickets" and LONG gave Detective Laero three stamp bags of heroin with the stamp "GNC". LONG then asked Detective Laero for his phone number, which Detective Laero provided to LONG. LONG told Detective Laero that he would call him at a later time about purchasing additional amounts of heroin from LONG. Several hours later, Detective LAERO received a phone call from telephone number 412-277-1530, where LONG identified himself as "Mitch" and referred to the three stamp bag transaction. LONG advised Detective Laero to use this phone number to contact him for additional amounts of heroin. Since this transaction, Detective Laero has spoken with LONG utilizing this phone number, and LONG has told Detective Laero that he was "ready", meaning Detective Laero was able to purchase heroin from LONG.

11.     In December 2016 and January 2017, Allegheny County Police Detectives developed multiple confidential sources of information who have provided the same telephone

4

number as the phone number that they have utilized, and are still able to utilize, to purchase heroin from Darnell BLAND and Veryl LONG. Each CS has stated that in order to purchase heroin, they would first call the phone number 412-277-1530 to arrange for the purchase. Shortly after making the phone call, the CS's would travel to a pre-determined location where they knew BLAND and LONG were holding heroin. Upon arrival, the CS's would then meet with a white male, identified by law enforcement as Gregory JAPALUCCI.

12. In December of 2016, Allegheny County Police developed CS-1 during an unrelated heroin overdose investigation. CS-1 was the friend of the victim, and was able to provide information regarding heroin distribution. CS-1 also admitted that he/she was a heroin user and has known Darnell BLAND for several years. CS-1 positively identified a photograph of BLAND and knew him as "Eric". CS-1 stated that he/she has purchased heroin from BLAND over the course of several years, and that BLAND is currently utilizing the same phone number to distribute heroin.

13. In December 2016 and January 2017, Allegheny County Police Detectives developed four additional confidential sources of information (hereinafter referred to as CS-2, CS-3, CS-4 and CS-5) who were able to provide information regarding BLAND and LONG and their heroin distribution activities.

14. CS-2 identified two black males in the Swissvale, PA area, by the names of "Q" (known to law enforcement as LONG) and "D" (known to law enforcement as BLAND). During surveillance, Allegheny County Police Detectives were able to observe a hand to hand drug transaction between CS-2 and JAPALUCCI. Shortly after this transaction, the Detectives conducted a traffic stop on CS-2, and found CS-2 to be in possession of bundle amounts of heroin. CS-2 immediately cooperated with law enforcement. CS-2 stated that he/she would call 412-277-

1530 to arrange for the purchase of heroin. CS-2 would then meet with JAPALUCCI in Swissvale, PA and obtain the heroin following this phone call.

15. CS-3 also identified two black males in the Swissvale, PA area, by the names of "Q" (known to law enforcement as LONG) and "D" (known to law enforcement as BLAND). During surveillance, Allegheny County Police Detectives were able to observe a hand to hand drug transaction between CS-3 and JAPALUCCI. Shortly after this transaction, the Detectives conducted a traffic stop on CS-3, and found CS-3 to be in possession of bundle amounts of heroin. CS-3 immediately cooperated with law enforcement. CS-3 stated that he/she would call 412-277-1530 to arrange for the purchase of heroin. CS-3 would then meet with JAPALUCCI in Swissvale, PA and obtain the heroin following this phone call.

16. CS-4 also identified a black male in the Swissvale, PA area, by the names of "D" (known to law enforcement as BLAND). During surveillance, Allegheny County Police Detectives were able to observe a hand to hand drug transaction between CS-4 and JAPALUCCI. Shortly after this transaction, the Detectives conducted a traffic stop on CS-4, and found CS-4 to be in possession of bundle amounts of heroin. CS-4 immediately cooperated with law enforcement. CS-4 stated that he/she would call 412-277-1530 to arrange for the purchase of heroin. CS-4 would then meet with JAPALUCCI in Swissvale, PA and obtain the heroin following this phone call.

17. CS-5 also identified a black male in the Swissvale, PA area, by the names of "D" (known to law enforcement as BLAND). During surveillance, Allegheny County Police Detectives were able to observe a hand to hand drug transaction between CS-5 and JAPALUCCI. Shortly after this transaction, the Detectives conducted a traffic stop on CS-5, and found CS-5 to be in possession of bundle amounts of heroin. CS-5 immediately cooperated with law enforcement. CS-

5 stated that he/she would call 412-277-1530 to arrange for the purchase of heroin. CS-5 would then meet with JAPALUCCI in Swissvale, PA and obtain the heroin following this phone call.

18. During the last week of January 2017, several of these CS's advised the Allegheny County Police Detectives that LONG and BLAND have relocated from the Swissvale, PA area to the south side area of Pittsburgh, PA to continue their heroin distribution. The CS's stated that LONG and BLAND are continuing to utilize 412-277-1530 in order to arrange for heroin transactions.

19. Over the next several months, agents and detectives conducted several undercover purchases utilizing these CS's, and also utilizing the phone number 412-277-1530 in order to set up each respective deal. During the phone call, the CS's would speak to a member of the DTO and would arrange for the purchase of heroin/fentanyl.

20. All drugs seized from the above detailed controlled purchases were sent to the Allegheny County Police Crime lab for analysis, and all drugs tested positive as being fentanyl and Butyryl Fentanyl.

## GPS PING DATA ANALYSIS

21. On February 2, 2017, your affiant obtained a court ordered GPS ping on phone number 412-277-1530, and have been monitoring the location of this telephone, which your affiant knows to typically be in the possession of Veryl LONG and Darnell BLAND, through Confidential source information, surveillance, as well as your affiant being able to identify the voice utilizing this phone number as Veryl LONG (specifically on February 17, 2017).

22. From the time period of approximately February 22, 2017 through March 2017, your affiant observed ping data at random time intervals through the night time hours (approximately 11:00 pm until 10:00 am), to determine where the phone was "sleeping" and where

7

the person controlling the phone was physically staying during night time hours, and is most likely maintaining a residence. The ping data, though not all inclusive, is as follows (identifying the accuracy prediction in meters, as well as the approximate location of the GPS data):

23.  3/7/17  11:38 pm  11 meters  1315 Patterson St (Residence of J'Vhante HAMPTON)

24.  3/8/17  8:18 am  15 meters  1315 Patterson St

25.  3/9/17  8:07 am  13 meters  1315 Patterson St

26.  3/10/17  7:50 am  15 meters  1315 Patterson St

27.  3/11/17  9:02 am  13 meters  1315 Patterson St

28.  3/12/17  11:59 pm  200 meters near Racquet Club Apartments, Monroeville, PA (location identified by multiple CS's where this organization distributes heroin on weekends)

29.  3/13/17  1:13 am  31 meters  1315 Patterson St

30.  3/14/17  12:14 am  15 meters  1315 Patterson St.

31.  In reference to the above listed GPS ping data, your affiant noted that during night time hours until morning hours from March 7 until March 15, 2017, the individual who was currently maintaining the phone with phone number 412-277-1530, which your affiant has identified through controlled purchases, undercover phone calls, and CS information, as the phone which is currently being utilized by the LONG and BLAND organization to arrange for the purchases of heroin/fentanyl, is "sleeping" at 1315 Patterson St, McKeesport, PA. On March 15, 2017, your affiant and other officers established surveillance at this location in the early morning hours. At approximately 8:56 am, officers observed an unknown black female (later identified as Nyshia PITTMAN) exit this location with a black male (later identified as J'Vhante HAMPTON).

Shortly after PITTMAN and HAMPTON drove away from the residence in PITTMAN's vehicle, a traffic stop was conducted on the vehicle for identification purposes. McKeesport police identified the driver as PITTMAN, and the passenger as HAMPTON. At this time, your affiant obtained GPS ping data, and this ping data indicated that telephone 412-277-1530 was located at the location of the traffic stop, indicating that the phone was in HAMPTON's possession, since the previous night, the GPS ping of the phone indicated 1315 Patterson St, McKeesport, PA, and it had not left this location until PITTMAN and HAMPTON departed.

32. In addition, your affiant and officers conducted a trash pull shortly after HAMPTON and PITTMAN departed the area. This trash was located directly behind the residence, and contained several pieces of mail and indicia with the name J'Vhante HAMPTON, to include important documents such as Parole documents and IRS tax documents.

33. Your affiant is familiar with HAMPTON and has personally interviewed HAMPTON several years ago while investigating the LONG heroin DTO for the first time. During that interview, HAMPTON stated that he had grown up with LONG and his associates, and that they had been distributing heroin together in the same manner as is currently established, where LONG and other leaders of the organization set up certain location with "workers" (heroin distributors) to distribute heroin on behalf of the organization. HAMPTON stated that he had distributed in the Monroeville, PA areas at that time, which is consistent with an area that the LONG and BLAND DTO are distributing from at this time. At that same time, an additional Confidential Source developed by the Pennsylvania State Police stated that he/she was aware that HAMPTON was distributing heroin for the LONG DTO in the New Kensington, PA area, and went by the nick names of "Spade" and "Diego". (NOTE: During the trash pull on March 15, 2017, your affiant located a piece of mail addressed to HAMPTON, where the author of the letter, who

9

is currently incarcerated, refers to HAMPTON as "Spade-O", indicating to your affiant that HAMPTON maintains this nick name.) In addition, your affiant has interviewed several Confidential Sources (CS-2 and CS-3 specifically), who had identified a black male by the name of "Diego" who distributes in Monroeville, PA for LONG and BLAND, through calling the same phone number, 412-277-1530, indicating that HAMPTON maintains this alias as well. CS-2 and CS-3 stated that they have purchased heroin/fentanyl directly from "Diego" aka J'Vhante HAMPTON in Monroeville, PA on past occasions, and have positively identified HAMPTON through photographs provided by law enforcement.

34. In addition, your affiant has examined HAMPTON's criminal record, and HAMPTON's record indicated an extensive criminal record to include arrests and convictions for: Possession of Firearms, multiple drug charges, multiple aggravated assaults, criminal mischief, resisting arrest, Escape, cruelty to animals, Firearms carried without a license, and recklessly endangering. HAMPTON is also currently on Parole with the State of Pennsylvania.

35. On March 21, 2017, agents and officers executed multiple search warrants as a result of this investigation, to include HAMPTON's residence located at 1315 Patterson St, McKeesport, PA. During this search, agents and officers located the following items: black ski mask, three (3) firearms, handguns and one rifle, ammunition, and six (6) cellular phones (**TARGET DEVICES 1-6**). In addition to this evidence, HAMPTON was read his Miranda warning (DEA-13 advice of rights), and HAMPTON made statements about his direct involvement in heroin trafficking within the BLAND/LONG DTO. HAMPTON also stated that he had purchased a pistol, rifle, ammunition, and the ski mask from an individual who is from the Homewood area of Pittsburgh, PA, approximately 3-4 weeks prior to this search warrant.

36.     The TARGET DEVICES are currently located in the evidence storage facility at the DEA Pittsburgh District Office at 1781 McKees Rocks Rd, McKees Rocks, PA 15136, and are stored in a manner that is designed to preserve the electronic data.

37.     Your Affiant submits that there is probable cause to search the devices found in HAMPTON's residence (**TARGET DEVICES 1-6**).

**EVIDENCE COMMONLY GENERATED BY DRUG-TRAFFICKING AND ELECTRONIICALLY STORED IN CELLULAR TELEPHONES**

38.     Your Affiant is aware through both training as well as experience gained through multiple narcotics investigations, the targets of those narcotics investigations utilize cellular telephones to not only arrange meetings with their drug customers but also speak with fellow co-conspirators as well as their drug sources of supply. Your Affiant is also aware that these targets also utilize multiple cellular telephones at one time in an effort to not only thwart detection by law enforcement but also to compartmentalize their drug trafficking customers to one phone, their co-conspirators to another phone, and their drug source of supply to yet another phone.

39.     Based upon my training and experience, I am aware that it is generally a common practice for drug traffickers to store the names and phone numbers of drug customers and photographs and video detailing illegal activities in cellular telephones. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier(s) and the trafficker's dealer(s). Additionally, drug traffickers must

11

maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

40. Persons involved in significant drug trafficking typically conceal within automobiles large amounts of currency, financial instruments, precious metals, jewelry and other items of value, and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money derived from narcotic trafficking activities. This type of evidence can also be stored in applications that are commonly found on "SMART" cellular telephones, such as those seized from the HAMPTON TARGET DEVICES that are referenced throughout this affidavit.

41. Members of Drug Trafficking Organizations (DTO) often take group photographs with other enterprise members posing with paraphernalia, money and/or drugs. Many cellular telephones have a camera feature that is readily capable of capturing and storing these group photos.

42. Members of DTOs often store each other's phone numbers and contact information in the directories of their cellular phones.

43. Based on my experience and familiarity with cellular telephones, I am aware that the telephones have voicemail and telephone directory features, as well as camera features which allow the user to take photographs and store them in the cellular phone's memory card. Based on my experience and training, statements by other law enforcement officers, and personal observations, I know that because of the storage capacity of cellular telephones, the portability of cellular telephones, the ease with which information stored on a cellular telephone may be accessed and/or organized, and the need for frequent communication in arranging narcotics transactions, cellular telephones are frequently used by individuals involved in drug trafficking. In particular,

I and other law enforcement officers have found that information frequently maintained on cellular telephones includes the contact numbers of other co-conspirators, contact numbers for narcotics customers and stored photographs of DTO activities. This evidence will come in the form of caller identification information, call log information, telephone numbers, address information, or other identification information, as well as opened and unopened voicemail and/or text messages, photographs, videos and information about access to the Internet.

44.     Members of DTOs routinely use multiple physical phones in succession as one breaks or the DTO feels that the number associated with the phone is compromised to Law Enforcement. The physical phone may no longer be an active communicative device, however many times, these old phones are not discarded as they possess value to the DTO. The replaced device contains within it the contact information for drug customers of the DTO, and many times these phones are maintained as digital phone books should the new active phone become unusable or unavailable. Furthermore, these replaced phones are commonly kept in a relatively accessible location where either all or select members of the DTO can access the information within should it become necessary. As stated above, members of DTOs routinely take photographs and or memorialize other information of evidentiary value within these replaced phones. As such, it is common to recover a multitude of otherwise inactive phones especially at locations central to or important to the DTO.

## TECHNICAL TERMS

45.     Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communications through radio signals. These telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless

telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

46. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

47. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

48. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

49. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how each device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by

15

      a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

50. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

51. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

52.     Based upon the foregoing, I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **TARGET DEVICES 1-6**, as described more fully in Attachment A, to seek the items described in Attachment B.

*/s/ Melissa Laukaitis*
MELISSA LAUKAITIS
Special Agent
Drug Enforcement Administration

Subscribed to and Sworn before me
This 12th day of April, 2019.

*/s/ Robert C. Mitchell*
ROBERT C. MITCHELL
United States Magistrate Judge